1  ANNA Y. PARK, CA SBN 164242
   MICHAEL J. FARRELL, CA SBN 266553
2  THOMAS S. LEPAK, CA SBN 245649
   thomas.lepak@eeoc.gov
3  U.S. EQUAL EMPLOYMENT
   OPPORTUNITY COMMISSION
4  LOS ANGELES DISTRICT OFFICE
   255 East Temple Street, Fourth Floor
5  Los Angeles, California  90012
   Telephone:    (213) 894-1032
6  Facsimile:    (213) 894-1301
   E-Mail:  lado.legal@eeoc.gov
7
   Attorneys for Plaintiff
8  U.S. EQUAL EMPLOYMENT
   OPPORTUNITY COMMISSION
9

10                  **UNITED STATES DISTRICT COURT**

11               **SOUTHERN DISTRICT OF CALIFORNIA**

12

13  U.S. EQUAL EMPLOYMENT              )  Civil Action No. 08-CV-1780 IEG PCL
    OPPORTUNITY COMMISSION,            )
14                                     )  **PLAINTIFF EEOC'S MEMORANDUM**
                                       )  **OF POINTS AND AUTHORITIES IN**
15              Plaintiff,             )  **OPPOSITION TO DEFENDANTS'**
                                       )  **MOTION FOR SUMMARY JUDGMENT**
16        v.                           )  **ON ALL CLAIMS; DECLARATIONS &**
                                       )  **EXHIBITS; CERTIFICATE OF SERVICE**
17  DILLARD'S INC., DILLARD STORE      )
    SERVICES, INC., and Does 1-11, Inclusive, )
18                                     )
                                       )
19              Defendant.            )
                                       )
20                                     )
                                       )
21  _____ )

22

23

24

25

26

27

28

                                    i

1
2

# **TABLE OF CONTENTS**

I.      Introduction ……………………………………………………………...1

II.     Background Facts …………………………………………………….....2

III.    Summary Judgment Standard ………………………………………….4

IV.    Dillard's Subjected Employees To Disability-Related Inquiries That Were Neither Job-Related Nor Consistent With Business Necessity …………………………………5

     A.     Dillard's Inquiry Into The "Condition Being Treated" Qualifies As A Disability-Related Inquiry Under The ADA. …………………………………………..5

     B.     Dillard's Cannot Establish That The Inquiry Policy Was Job-Related *And* Consistent With Business Necessity As A Matter Of Law. ……………………11

          1.     Dillard's Fails To Point To A Vital Business Necessity Served By The Policy  …………………………………………….………..12

          2.     Dillard's Inquiries Were Not Consistent With Business Necessity Because They Did Not Carefully Target The Claimed Necessity ……………...14

V.     Summary Judgment On Compensatory And Punitive Damages Claims For Violations Of § 12112(D) Violations Is Improper …………………………………………………18

VI.    There Are Material Issues Of Fact Regarding Punitive Damages ……………………...18

     A.     Dillard's Knew There Was A Risk That Its Policy Violated The ADA  ………..18

     B.     Dillard's Knew There Was A Risk That Its Policy Was Not Within The Business Necessity Exception …………………………………………………………21

VII.   Summary Judgment On EEOC's Claim For Injunctive Relief Is Improper ……………22

VIII.  Conclusion ……………………………………………………………..25

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**TABLE OF AUTHORITIES**</u>

<u>**CASES**</u>

*Alvarado v. Cajun Operating Co.,*
   588 F.3d 1261(9th Cir. Ariz. 2009) …………………………………………….17

*Bates v. Dura Auto. Sys.,*
   2011 U.S. Dist. LEXIS 97692 (M.D. Tenn. Aug. 30, 2011) …………………………..17

*Bates v. United Parcel Serv., Inc.*
   511 F.3d 974 (9th Cir. 2007) …………………………………………………….12

*Brownfield v. City of Yakima,*
   612 F.3d 1140 (9th Cir. 2010) …………………………………………..12, 13, 14

*Cavanaugh v. U.S. Dist. Court,*
   306 F.3d 726 (9th Cir. 2002) …………………………………………………...16

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ……………………………………………………………….4

*Corley v. United States,*
   556 U.S. 303, 129 S. Ct. 1558 (2009) …………………………………………..16

*Conroy v. New York Dep't of Corr. Serv.,*
   333 F.3d 88 (2d Cir. 2003) …………………………………………….7, 8, 9, 10, 12,
                                                                            13, 14, 19, 20, 22

*Cripe v. City of San Jose,*
   261 F.3d 877 (9th Cir. 2001) ……………………………………………………12

*Doe v. U.S. Postal Serv.,*
   317 F.3d 339 (D.C. Cir. 2003) …………………………………………………..6, 10

*Dvorak v. Clean Water Servs.,*
   319 Fed. Appx. 538 (9th Cir. 2009) ………………………………………………8

*EEOC v. Prevo's Family Mkt., Inc.,*
   135 F.3d 1089 (6th Cir. 1998) ………………………………………………5, 12

*Fredenburg v. Contra Costa Cnty Dep't of Health Servs.,*
   172 F.3d 1176 (9th Cir. 1999) ……………………………………………………11

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
   120 S. Ct. 693 (U.S. 2000) …………………………………………...23, 24, 25

iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Harrison v. Benchmark Elec. Huntsville, Inc.*,
    593 F.3d 1206 (11th Cir. 2010) ……………………………………………………………7

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002) …………………………………………………………18

*Henderson v. United States*,
    476 U.S. 321 (U.S. 1986) ………………………………………………………………16

*Hernandez v. Spacelabs Med. Inc.*,
    343 F.3d 1107 (9th Cir. 2000) …………………………………………………………...4

*Indergard v. Georgia-Pacific Corp.*,
    582 F.3d 1049 (9th Cir. 2009) …………………………………………6, 7, 8, 11, 16

*Indergard v. Georgia-Pacific Corp.*,
    2010 Dist. LEXIS 69887 (D. Or. June 14, 2010) ………………………………………17

*Kirkish v. Mesa Imports*,
    No. 10-15480, 2011 WL 2647995 (9th Cir. July 7, 2011) …………………………………6

*Kolstad v. Am. Dental Ass'n.*,
    119 S. Ct. 2118 (1999) …………………………………………………………………18

*Lee v. City of Columbus, Ohio*,
    636 F.3d 245 (6th Cir. 2011) …………………………………………………………9, 10

*L.A. v. Lyons*,
    461 U.S. 95 (1983) …………………………………………………………………24, 25

*Meritor Sav. Bank v. Vinson*,
    477 U.S. 57 (1986) …………………………………………………………………...11

*Miller v. Glenn Miller Prod., Inc.*,
    454 F.3d 975 (9th Cir. 2006) …………………………………………………………4

*Mitchell v. Dupnik*,
    75 F.3d 517 (9th Cir.1996) ……………………………………………………………...23

*Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*,
    210 F.3d 1099 (9th Cir. 2000) …………………………………………………………...4

*Roe v. Cheyenne Mountain Conference Resport, Inc.*,
    124 F.3d 1221 (10th Cir. 1997) ……………………………………………………………10

*Scott v. Napolitano,*
    717 F. Supp. 2d 1071 (S.D. Cal. 2010) ……………………………………………6, 7, 10

*Sullivan v. River Valley Sch. Dist.,*
    197 F.3d 804 (6th Cir. 1999) …………………………………………..……12, 13

*United States v. Ritchie,*
    362 Fed. Appx. 687 (9th Cir. 2010) ………………………………………………17

*Vitek v. Jones,*
    445 U.S. 480 (1980) ………………………………………………………....23

*Yin v. State of Cal.,*
    95 F.3d 864 (9th Cir. 1996) ……………………………………………………6, 13

**STATUTES, CODES, REGULATIONS, & GUIDANCE**

42 U.S.C. § 1981(a)(2) …………………………………………….....15, 17

42 U.S.C. § 12101(b)(1) ……………………………………………………5

42 U.S.C. § 12101(b)(2) …………………………………………………6

42 U.S.C. § 12101(b)(5) ……………………………………………15, 18

42 U.S.C. § 12112 ……………………………………………………15, 16, 17

42 U.S.C. § 12112(a) ……………………………………………………15, 17

42 U.S.C. § 12112(b)(5) …………………………………………………..15, 16, 17

42 U.S.C. § 12112(d) ……………………………………………15, 16, 17, 19

42 U.S.C. § 12112(d)(4) ……………………………………………………6, 7

42 U.S.C. § 12112(d)(4)(A) ……………………………………………………Passim

42 U.S.C. § 12112(d)(4)(B) …………………………………………………...6

Fed. R. Civ. P. 56(a) ……………………………………………………....4

EEOC Enf. Guid. No. 915.002 re" ADA –
    Disability-Related Inquiries and Medical Exam. (July 27, 2000) ………………...3, 11, 19

v

1

## <u>LEGISLATIVE HISTORY & SECONDARY SOURCES</u>

2

3

H.R. Rep. 101-485(III) § 102(c) (1990) ……………………………………………....5

4

H.R. Rep. 102-40(II) (1990), reprinted 1991 U.S.C.C.A.N. 694 ………………………...16

5

6

C. Kuczynski, "ADA: Disability-Related Inquiries and Medical Examination of Employees, EEOC Informal Opinion Ltr. (Oct. 5, 2004) …………………………………………..…21

7

Chai R. Feldblum, *Medical Examinations and Inquiries Under the [ADA]: A View from the Inside*, 64 Templ. L. Rev. 521, 539 (1991) ……………………………………………...…..5

8

9

Erwin Chemerinsky, Federal Jurisdiction 139 (5th ed.2007) …………………………...22, 23

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.      Introduction.**

2         Plaintiff U.S. Equal Employment Opportunity Commission ("EEOC") files this

3    opposition to Defendants Dillard's Inc. and Dillard Store Services, Inc.'s (collectively,

4    "Dillard's") first motion for summary judgment on all claims, ECF No. 73.[1]

5         Dillard's entire motion is based on its misleading characterization of the unlawfully

6    invasive policy at issue, the aggressive and threatening manner in which Dillard's enforced that

7    policy, and the damages that resulted therefrom.  As explained in detail herein, the evidence in

8    this case demonstrates that Dillard's did, in fact, require employees who needed a health-related

9    absence from work to disclose whether they had a disability and the specific nature of that

10   disability.  These are inquiries which are expressly prohibited by § 12112(d)(4)(A) of the ADA.

11   Employees who refused to submit to this inquiry were threatened with, and in some cases

12   actually subjected to, an unexcused absence and, ultimately, termination.

13        In its motion, Dillard's argues that because the ADA and EEOC Guidance agree that

14   employers can ask an employee to provide a doctor's note explaining the need for a health–

15   related absence, its policy, as a matter of law, must comply with the ADA.  This case is not about

16   the requirement to provide a doctor's note or an explanation for an absence, however.[2]  EEOC

17   brought this case because Dillard's went far beyond the doctor's note or other explanation

18   allowed by the ADA and EEOC Guidance.  As demonstrated by the evidence, Dillard's was not

19   satisfied with a doctor's note explaining the need for a health-related absence, but instead

20   required the employee to disclose her specific diagnoses, conditions, or disabilities in order to

21   have such an absence excused and, thus, to keep her job.  Dillard's enforced this requirement

22   without any consideration for how invasive, humiliating, or stigmatizing such a disclosure might

23   be.   Contrary to Dillard's assertions, such conduct is not permitted by the ADA or EEOC.

24

25   ---

26   [1]      Dillard's filed a second motion for summary judgment on all claims and to preclude
     recovery for various claimants, ECF No. 76, which EEOC addresses in a separate opposition.

27   [2]      If Dillard's policy required nothing more than a health care provider's explanation of a
28   health-related absence, Ms. Scott would not have been compelled to file her EEOC charge and
     this case would not be currently pending before this Court.  (Ex. H, Scott Dep. 166: 25-167:14).

1    Rather, it is an unlawful inquiry that clearly violates the express provisions of § 12112(d)(4)(A).

2    This policy and practice is the unlawful inquiry at issue in this case.

3    Dillard's also argues that, even if its policy is deemed to be an inquiry under §

4    12112(d)(4)(A)—which it is—Dillard's is not liable for the violation because the inquiry was

5    "job-related and consistent with business necessity."  Again, the argument is unsustainable.  As

6    explained herein, Dillard's, as a retail department store, cannot establish any business necessity

7    or justification for requiring the disclosure of an employee's disability or the nature of the

8    disability.  Rather, under the ADA and EEOC Guidance, a doctor's note alone would have

9    allowed the employee to verify the need for a health-related absence without disclosing the

10   nature of his or her disability.  Moreover, the fact that since 2007 Dillard's has been successfully

11   operating its business without requiring disclosure of the condition being treated belies any

12   business-necessity argument.

13   Finally, contrary to Dillard's assertions, compensatory and punitive damages and

14   injunctive relief are not only provided for by statute in this case, but each is both supported by

15   the evidence and necessary to adequately address Dillard's violations.  For these reasons, EEOC

16   respectfully requests that this Court deny Dillard's motion for summary judgment on all bases—

17   i.e., whether the policy constitutes an inquiry under the ADA, whether Dillard's can claim a

18   business necessity defense, and whether Dillard's has shown that there is no dispute as to the

19   appropriateness of compensatory and punitive damages, and injunctive relief.

20   **II.    Background facts.**

21   This case concerns the Dillard's retail department store located in El Centro, California,

22   and the employees thereof to whom Dillard's subjected its health-related absence policy.

23   Complaint 1:26-2:11, ECF No. 1.  Under Dillard's policy, any health-related absence from work

24   was unexcused unless and until Dillard's chose to excuse it.  (Ex. A, B, and C.)[3]  To excuse a

25   health-related absence, however, Dillard's required that the employee submit a note from a

26

27   ---

[3]    All exhibit references herein refer to the exhibits attached to the declaration of EEOC

28   Trail Attorney Thomas Lepak.  For ease of reference, the exhibits attached to each opposition are
the same, even if some documents in not referred to in the specific motion.

1    medical provider that "must state the condition being treated."[4]  (Ex. B. ("No proper note=no

2    excused absence."))  When an employee accumulated four unexcused absences, Dillard's

3    terminated her.  (Ex. D, Scott Decl. ¶¶ 3-7.)  Dillard's asserts two needs for disclosure of the

4    condition being treated—i.e., "to verify[] the legitimacy of the medical absence and effectuat[e]

5    the Policy, which permitted only verifiable medical absences to be excused" and "to ensure an

6    employee can safely return to work and does not pose a direct threat to the health or safety of

7    other individuals in the workplace."  Defs.' Mem. P. & A. Supp. Mot. Summ. J. ("Defs.' 1st

8    Mem.") 14:3-5, 15:18-21 (quotation marks omitted).

9         Dillard's first implemented the policy in March 2005.  (Ex. A.)  At the time, Dillard's

10   issued a memorandum explaining that in order for a health-related absence to be excused, an

11   employee must submit a note from her medical provider stating "the nature of the absence (such

12   as migraine, high blood pressure, etc.").  (Ex. A.)  In June 2006, Dillard's reaffirmed the policy

13   with a more-clear statement of what the company was demanding: "Current requirements for a

14   Doctor's note *remain the same* (must state the *condition being treated*, must be signed, etc.-

15   whatever you require as stated in your posted policy)."  (Ex. B (emphasis added).)[5]  Thus,

16   regardless of any claimed ambiguity in the "nature of the absence (such as migraine, high blood

---

[4]      EEOC does not allege that Dillard's violated the ADA by requiring a doctor's note.  As
pointed out by Dillard's, Defs.' 1st Mem. 1:17-24, EEOC Guidance provides that requiring a
doctor's note is a reasonable way to verify an employee's absence.  This case concerns Dillard's
policy requiring that note to state the condition being treated which, in the case of a disabled
individual, would require disclosure of the nature of the disability.

[5]      Amy Breehl, the Assistant Store Manager from November 2006 until January 2009,
agrees: "Under Dillard's policy that was in effect when I began employment, a medical-provider
note would not excuse a health-related absence if it did not state the medical condition being
treated.  (Ex. E, Breehl Decl. ¶ 4.)  *See also* Ex. B at 2 ("Doctor's Note MUST contain the
medical reason(s) for the absence to be excused."); Ex. F at 2 ("Our policy also required that the
doctor's note contain the medical reason(s) for the absence to be excused so we could continue
our policy of determining FMLA/A.D.A. applicability."); Ex. G ("Doctor's notes MUST contain
the medical reason(s) for the absence to be excused . . . .  The information provided is ONLY
used to verify the necessity of the absence and to determine whether or not the absence may be
covered by either [sic] FMLA or the A.D.A.").

pressure, etc.") phrase used in the March 2005 memorandum, all along, as described in Dillard's June 2006 reaffirmation, Dillard's policy required employees to reveal their medical conditions.

Dillard's subjected Charging Party Corina Scott to this policy.  Ms. Scott was absent from work between May 29 and June 3, 2006.  (Ex. D, Scott Decl. ¶ 6.)  She returned to work with a doctor's note explaining that she was absent for medical reasons.  (*Id*.)  Ms. Scott's supervisor rejected the note, however, telling Ms. Scott that the note needed to state the condition being treated.  (*Id*.)  Ms. Scott refused to reveal the underlying condition, even alerting her supervisor that the policy was unlawful.  (*Id*.)  The supervisor reminded Ms. Scott that refusing to reveal the condition would result in her termination.  (*Id*.)  The supervisor even suggested that Ms. Scott invent a condition to write on the note.  (*Id*.)  Ms. Scott refused to falsify a condition, however, and continued to refuse to be subjected to the inquiry.  (*Id*. at ¶¶ 6-7.)  In response, at that moment, the supervisor terminated Ms. Scott.  (*Id*. at ¶ 7.)

Through its policy, Dillard's inquired into Ms. Scott and other employees' medical conditions and disabilities without a sufficiently vital business necessity and without limiting the inquiries to specific job duties or information related to any necessity claimed by Dillard's.  Dillard's enforced this policy despite the fact that the ADA, case law, and EEOC Guidance made clear that seeking information about the nature of a medical condition and/or disability qualifies as an unlawful medical inquiry under the ADA.

## III.   Summary-judgment standard.

Summary judgment is appropriate when, viewing the evidence most favorably to the non-moving party and drawing all reasonable inferences in its favor, there appears "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2000).  A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to find for the non-moving party.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  The moving party bears the burden of showing the absence of a genuine issue of material fact.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Here, the evidence of record establishes that Dillard's, in a

1    written policy, inquired into its employees' disabilities into the nature of those disabilities.

2    Dillard's can establish no business necessity for this unlawful inquiry, and, as such,

3    compensatory and punitive damages and injunctive relief are appropriate.  At a minimum, the

4    record establishes that there are genuine issues of material fact with regard to the issues of

5    liability and damages under the ADA.  Thus, this Court should deny Dillard's motion for

6    summary judgment in its entirety.

7    **IV.    Dillard's subjected employees to disability-related inquiries that were neither job-**

8    **related nor consistent with business necessity.**

9            In its motion, Dillard's clouds the issue of liability in this case by arguing at length that

10   EEOC is somehow advocating for a broader definition of what constitutes an unlawful medical

11   inquiry than what Congress intended in § 12112(d)(4)(A) of the ADA.  The assertion is

12   misplaced.  The plain language of the ADA, Congress's intent in passing that statute, and

13   applicable federal precedent all support a finding that the inquiry at issue in this case is unlawful.

14           Congress enacted the ADA "to provide a clear and comprehensive national mandate for

15   the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).

16   To that end, Congress dictated that an employer "shall not require a medical examination and

17   shall not make inquiries of an employee as to whether such employee is an individual with a

18   disability or as to the nature or severity of the disability."  42 U.S.C. § 12112(d)(4)(A).   "Part of

19   the concern of the Congress in creating the ADA and the ability of employers to require

20   employees to undergo medical examinations was the unwanted exposure of the employee's

21   disability and the stigma it may carry."  *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094

22   n.8 (6th Cir. 1998) (citing Chai R. Feldblum, *Medical Examinations and Inquiries Under the*

23   *[ADA]: A View from the Inside*, 64 Templ. L. Rev. 521, 539 (1991)).

24           Congress cautioned that "an inquiry . . . that is not job-related serves no legitimate

25   employer purpose, but simply serves to stigmatize the person with a disability."  H.R. Rep. 101-

26   485(III) § 102(c) (1990) ("While the employer may argue that it does not intend to penalize the

27   person, the person with cancer may object merely to being identified, independent of the

28   consequences.  Being identified as having a disability often carries both blatant and subtle

5

stigma."); *see also Doe v. U.S. Postal Serv.*, 317 F.3d 339, 344 (D.C. Cir. 2003) ("…Congress's purpose in enacting the ADA . . . was, at least in part, to permit employers to inquire into employees' medical conditions in order to provide reasonable accommodations, while avoiding subjecting employees to the blatant and subtle stigma that attaches to being identified as disabled.").  Thus, although Congress recognized that an employer "may make inquiries into the ability of an employee to perform job-related functions," 42 U.S.C. § 12112(d)(4)(B), Congress placed the burden on the employer to show that its inquiries both are in response to a business necessity and are tailored toward that claimed necessity.  *See Indergard v. Georgia-Pacific Corp.*, 582 F.3d 1049, 1052-53 (9th Cir. 2009).  Because Dillard's policy was an inquiry into the nature of a disability as prohibited under the ADA, and because Dillard's cannot show any business necessity, this Court should reject the claim that its policy did not violate the ADA.

A.      **Dillard's inquiry into the "condition being treated" qualifies as a disability-related inquiry under the ADA.**

The ADA makes any disability-related inquiry[6] unlawful, unless the employer shows that the inquiry was a business necessity.  42 U.S.C. § 12112(d)(4)(A).  The Ninth Circuit has not had occasion to directly rule on what constitutes a disability-related inquiry.[7]  But other courts, including courts in this district, have considered the issue.  Recognizing Congress's intent "to provide clear, strong, consistent, enforceable standards" in the ADA, 42 U.S.C. § 12101(b)(2), these courts appear to have settled on a straightforward, workable definition of "inquiry" under

---

[6]      Contrary to Dillard's characterization, several federal courts, including the Ninth Circuit, use the phrase "disability-related inquiry" to refer to an inquiry under § 12112(d)(4).  *See, e.g., Kirkish v. Mesa Imports*, No. 10-15480, 2011 WL 2647995 at *1 (9th Cir. July 7, 2011) (unpublished); *Scott v. Napolitano*, 717 F. Supp. 2d 1071, 1082-85 (S.D. Cal. 2010).

[7]      Dillard's cites to *Yin v. State of Cal.*, 95 F.3d 864 (9th Cir. 1996) to support its interpretation of what qualifies as an "inquiry" under § 12112(d)(4)(A).  Defs.' 1st Mem. 6:1-23, 7:9-11.  As explained more fully in EEOC's opposition to Dillard's Motion to Preclude Recovery, Dillard's mischaracterizes the decision where the court did not reach whether the examination qualified as a disability-related examination under § 12112(d)(4).  95 F.3d at 868 (assuming that the examination was prohibited under § 12112(d)(4)(A)); *see also Indergard*, 582 F.3d at 1056 (subsequent decision not requiring any particular goal or purpose).

the ADA—i.e., any inquiry likely to elicit information related to a disability.  *See, e.g., Conroy v. New York Dep't of Corr. Serv.*, 333 F.3d 88, 95 (2d Cir. 2003) ("may tend to reveal a disability"); *Harrison v. Benchmark Elec. Huntsville, Inc.*, 593 F.3d 1206, 1216 (11th Cir. 2010) ("likely to elicit information about a disability"); *Scott v. Napolitano*, 717 F. Supp. 2d 1071, 1084 (S.D. Cal. 2010) ("likely to elicit information about a disability").

In *Indergard*, the Ninth Circuit applied a comparable definition when analyzing a disability-related examination under § 12112(d)(4)(A) of the ADA, which is the same section relevant to this case.  The *Indergard* case concerned an employer that subjected its employee to a treadmill/blood-pressure test.  *Indergard*, 582 F.3d at 1051-1052, 1056 n.3.  To determine if the test was a disability-related examination, the Ninth Circuit asked whether the examination "could have revealed a disability."  *Id*. at 1056.  Because the treadmill/blood-pressure test at issue "clearly sought information about [the employee's] physical or mental impairments or health . . . and involved tests and inquiries capable of revealing to [the employer] whether [the employee] suffered from a disability," the court found that the examination "[u]nquestionably" qualified as a disability-related examination under § 12112(d)(4)(A).  *Id*. at 1056, 1056 n.3 (quotation marks and citations omitted).  This "could have revealed" standard applied in *Indergard* is consistent with, if not more inclusive than, the straightforward "likely to elicit information about a disability" standard adopted by multiple courts.

When addressing the examination in *Indergard*, the Ninth Circuit relied on the inquiry analysis in *Conroy v. New York Dep't of Corr. Serv.*, 333 F.3d 88 (2d Cir. 2003):

> [T]he Second Circuit has held [in *Conroy*] that an employer's policy that all employees returning from sick leave provide a medical certification that included a brief general diagnosis that is sufficiently informative as to allow [the employer] to make a determination concerning the employee's entitlement to leave was sufficient to trigger the protections of the ADA under 42 U.S.C. § 12112(d)(4)(A) because the general diagnosis may tend to reveal a disability.

*Indergard*, 582 F.3d at 1056 (quotation marks omitted) (finding *Conroy*'s inquiry analysis "useful").  The Ninth Circuit compared the *Indergard* examination to the *Conroy* inquiry.  *Id.* The court reasoned that, because the blood-pressure test in *Indergard* sought information about blood pressure in much the same way that the general-diagnosis inquiry in *Conroy* sought similar

1    information, the blood-pressure test could also elicit information related to a disability.  *Id*. at

2    1056-57.  "Unquestionably, this [was] a medical examination."  *Id*. at 1056-57 n.3.

3            The Ninth Circuit found that *Indergard*'s examination into blood-pressure could elicit

4    disability-related information.  Likewise, Dillard's inquiry into blood pressure[8] could elicit

5    disability-related information.  In fact, because Dillard's policy required more than blood-

6    pressure information, including disclosure of any "condition being treated," Dillard's invasive

7    policy is even more likely to elicit disability-related information than the limited blood-pressure

8    test in *Indergard*.[9]  More than the *Indergard* test, Dillard's policy was likely to elicit information

9    related to a disability.  Thus, Dillard's policy, unquestionably, is an inquiry under the ADA.

10           Although the examination-inquiry comparison described above is persuasive, this Court

11   does not need to rely on it because the Ninth Circuit has already approved *Conroy*'s directly-

12   relevant inquiry analysis.  *See id*. at 1056 (finding *Conroy*'s inquiry analysis "useful").  Dillard's

13   policy would qualify as a disability-related inquiry under that *Conroy* standard.

14           In *Conroy*, the Second Circuit primarily addressed a policy stating that absences of four

15   days or more required a doctor's note stating "a general diagnosis."  *Conroy*, 333 F.3d at 92, 95.

16   According to the *Conroy* policy, the note had to be specific enough to determine if the employee

17   was entitled to leave or should be examined by the employer's health services.  *Id*. at 92, 95 ("If

18   a doctor's note states that an employee is 'under my care', this is not sufficient.  However, if a

19   doctor's note, for example, states 'recuperating from minor surgery' or 'treated for a minor foot

20   injury', this is a sufficient diagnosis.") (quotation marks omitted).  Through application of the

21   Second Circuit's straightforward may-tend-to-reveal standard, the court found that "[i]t is clear

22

23       [8]     Dillard's March 2005 memorandum explicitly lists "high blood pressure" as the type of

24   information the policy required.  (Ex. A.)  Thus, Dillard's inquiry seeking blood-pressure

25   information is directly comparable to *Indergard*'s examination seeking blood-pressure
     information.

26       [9]     More directly, Dillard's lists "migraine" as the type of information the policy required.

27   (Ex. A.)  Because migraines could qualify as a disability under the ADA, the request for
     migraine information can be viewed as a direct inquiry into disability.  *Dvorak v. Clean Water

28   Servs.*, 319 Fed. Appx. 538, 539-40 (9th Cir. 2009) (unpublished) (reversing summary judgment
     for employer where employee had "severe neck pain and frequent migraines").

1   that even what [the employer] refers to as a 'general diagnosis' may tend to reveal a disability."

2   *Id*. at 95 ("requiring a general diagnosis is sufficient to trigger the protections of the ADA . . .

3   .").[10]  Thus, the court affirmed summary judgment for the plaintiff on the inquiry element.  *Id*.

4          Whereas the inquiry policy in *Conroy* sought only a "general diagnosis" and made clear

5   that the employee need not list any specific medical condition, Dillard's written policy explicitly

6   demanded the "condition being treated."  Thus, to a greater degree than the request for a general

7   diagnosis in *Conroy*, Dillard's request for the condition underlying the absence was likely to

8   elicit disability-related information.[11]  Because Dillard's policy demanding the condition being

9   treated is more likely to reveal a disability—and in fact expressly required the outright disclosure

10  of any disability—than the general diagnosis policy affirmed in *Conroy*, this Court should deny

11  Dillard's motion for summary judgment as to EEOC's inquiry claim.

12         Dillard's attempts to frame *Lee* as subverting *Conroy*'s usefulness are unavailing.

13  *Conroy* and *Lee* both address the inquiry standard.  *Id*. at 95; *Lee v. City of Columbus, Ohio*, 636

14  F.3d 245, 250 (6th Cir. 2011).  The two cases concern essentially the same policy that "required

15  employees to submit general diagnoses as part of a medical certification procedure following

16  certain absences."  *Lee*, 636 F.3d at 253 (citing *Conroy*, 333 F.3d at 92).  Although the Sixth

17  Circuit in *Lee* disagreed with the Second Circuit in *Conroy* with regard to whether a "general

18  diagnosis" requirement amounted to an inquiry under the ADA,[12] *id*. at 254-55,[13] the Sixth

19

20  [10]     Beyond the logic of the analysis, the Second Circuit's result comports with Congress's
21  intent in formulating the ADA: because "general diagnoses may expose individuals with
    disabilities to employer stereotypes, the Policy implicates the concerns expressed in these
22  provisions of the ADA."  *Conroy*, 333 F.3d at 95.  According to the Second Circuit, subjecting
23  employees to the policy, which is much less intrusive than the Dillard's policy, was "the injury
    prohibited by the ADA's prohibition against inquiries into disability."  *Id*. at 95.

24  [11]     Further, by admitting that Dillard's policy was meant to allow the company to "determine
25  whether or not the absence may be covered by . . . the A.D.A.," Dillard's all but admits that the
    policy was actually designed to elicit disability information.  (Ex. G; Ex. F at 2 (". . . so we could
26  continue our policy of determining FMLA/A.D.A. applicability."); Defs.' 1st Mem. 3:3-8 (". . .
27  to determine whether or not the absence may be covered by . . . the ADA.").

28  [12]     In *Lee*, the Sixth Circuit highlights two primary concerns with the *Conroy* opinion
    regarding general diagnoses.  First, the Sixth Circuit felt that *Conroy* "unnecessarily swept

9

1  Circuit accepted that "seeking information about illnesses, mental conditions, or other

2  impairments an employee has or had in the past trigger[s] the ADA's . . . protections." *Id*. at 254

3  (citing *Scott v. Napolitano*, 717 F. Supp. 2d 1071, 1084-85 (S.D. Cal. 2010)).[14]  On its face,

4  Dillard's policy seeking information about the condition being treated directly seeks information

5

6  within the statute's prohibition numerous legitimate and innocuous inquiries that are not aimed at
7  identifying a disability." *Lee*, 636 F.3d at 254.  But because Dillard's explicitly sought the
8  condition being treated, there can be no doubt under any standard that the inquiries were not
   innocuous.  Second, the Sixth Circuit seemed concerned that *Conroy* involved an ADA claim,
9  whereas *Lee* involved the Rehabilitation Act which "expressly prohibits discrimination *solely* on
10 the basis of disability."  *Id*. at 250 (emphasis in original).  According to the court, "[t]he mere
   fact that an employer, pursuant to a sick leave policy, requests a general diagnosis that *may tend
11 to lead* to information about disabilities falls far short of the [Rehabilitation Act's] requisite
   proof that the employer is discriminating *solely* on the basis of disability."  *Id*. at 255 (emphasis
12 in original).  This is not a legitimate concern in this ADA case.

13 [13]      Other circuit courts have followed *Conroy*'s analysis, even where the inquiry sought only
   general information.  *See, e. g., Doe v. U.S. Postal Serv.*, 317 F.3d 339, 341, 344 (D.C. Cir.
14 2003) (requirement to reveal the "nature of the illness" or to "describe the medical facts [of the
   condition]" was a disability-related inquiry); *cf. Roe v. Cheyenne Mountain Conference Resport,
15 Inc.*, 124 F.3d 1221, 1226, 1233, 1237 (10th Cir. 1997) (affirming summary judgment for
   employee where requirement to reveal all drugs in system, but not specific medical conditions,
16 was a disability-related inquiry); This Court has also depended on *Conroy* to find that even a
   generalized requirement to "give details" about a condition was a disability-related inquiry.
17 *Scott v. Napolitano*, 717 F. Supp. 2d 1071, 1083-84 (S.D. Cal. 2010) ("These questions clearly
   qualify as 'disability-related inquiries' because they are likely to elicit information about a
18 disability.  All of the questions broadly seek information about illnesses, mental conditions, or
   other impairments Plaintiff has or had in the past.").  Because Dillard's seeks the actual
19 condition being treated, its policy, unquestionably, is a disability-related inquiry.
20

21 [14]      Citing *Lee*, Dillard's asserts that "[a]s a matter of law, generalized and uniform inquiries,
   such as the ones utilized by Dillard's are not prohibited inquiries . . . as defined by the ADA."
22 (Def. Mem. Supp. Mot. Summ. J. 16, ECF No. 73-1)  Reliance on *Lee* for this assertion is
   misplaced here.  As recognized by EEOC Guidance, the ADA allows a general doctor's-note
23 requirement that applies to everyone.  However, generalized and uniform inquiries are *not* the
   inquiries Dillard's made here.  Further, whether a policy is applied to all employees has no
24 relation to whether it qualifies as a disability-related inquiry.  Indeed, the only appropriate
   consideration under § 12112(d)(4)(A), and most straightforward standard, is whether the inquiry
25 is likely to elicit disability information.  Finally, the discussion in *Lee* regarding whether the
   policy "is intended to reveal or necessitates revealing a disability" is irrelevant because the
26 analysis under the ADA does not concern intent.  *See Lee*, 636 F.3d at 255 (citing inapplicable
   agency regulations regarding the Rehabilitation Act); *see also* n. 6, *supra*.
27

28

10

about illnesses, mental conditions, or other impairments.  Thus, Dillard's policy would qualify as an inquiry under the ADA under both *Lee* and *Conroy*.

Consistent with Ninth Circuit case law, EEOC Guidance agrees that a "disability-related inquiry" is "a question (or series of questions) that is likely to elicit information about a disability."  *EEOC Enforce. Guid. No. 915.002 re: ADA Inquiries & Med. Exam.,* Section B.1 (7/27/2000).[15]  As an example, the Guidance explains that disability-related inquiries "may include the following: . . . asking an employee a broad question about his/her impairments that is likely to elicit information about a disability (e.g., what impairments do you have?)"  *Id.*  Indeed, where Dillard's already has a certified doctor's note excusing the absence, asking for the underlying condition can serve no purpose other than to obtain information about a disability. Thus, under the clear "likely to elicit disability information" standard, or any standard, Dillard's policy qualifies as a disability-related inquiry.  This Court should deny Dillard's motion for summary judgment on that element.

**B.      Dillard's cannot establish that the inquiry policy was job-related *and* consistent with business necessity as a matter of law.**

Recognizing that there may be situations where a disability-related inquiry is appropriate, Congress allows an employer may make an examination or inquiry if "such examination or inquiry is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A); *Fredenburg v. Contra Costa Cnty Dep't of Health Servs.*, 172 F.3d 1176, 1182-1183 (9th Cir. Cal. 1999) ("job-relatedness and business necessity . . . are both factual determinations").  The employer bears the burden of proving this defense.  *Indergard v. Georgia-Pacific Corp.*, 582 F.3d 1049, 1052-53 (9th Cir. 2009).

When evaluating whether an examination or inquiry qualifies for the business necessity defense, courts "must be keen to guard against the potential for employer abuse of such exams"

---

[15]      Although not controlling, EEOC regulations and guidance "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Indergard v. Georgia-Pacific Corp.*, 582 F.3d 1049, 1053 (9th Cir. 2009) (using EEOC guidance regarding disability-related examinations under § 12112(d)(4)(A)) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986)).

or inquiries." *See Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2010) ("Section 12112(d)(4)(A) prohibits employers from using medical exams as a pretext to harass employees or to fish for nonwork-related medical issues and the attendant 'unwanted exposure of the employee's disability and the stigma it may carry.'") (quoting *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 n.8 (6th Cir. 1998)). Thus, "the business necessity standard is quite high, and is not to be confused with mere expediency." *Id.* at 1146 (9th Cir. 2010) (quotation marks omitted) (citing *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001) ("[the business necessity standard] is quite high")); *Bates v. United Parcel Serv., Inc.,* 511 F.3d 974, 997 n. 14 (9th Cir. 2007) ("Application of the business necessity defense is fact-intensive and requires close analysis by the district court.").

To claim a business necessity defense, an employer must first show that its need for the inquiry is job-related, i.e., that the asserted necessity for the inquiry is "vital" to the business. *Conroy*, 333 F.3d at 97; *see also Cripe*, 261 F.3d at 890 ("a necessity must substantially promote the business' needs") (quotation marks omitted). The employer must then show that the inquiry is consistent with that business necessity—i.e., that "the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary." *Conroy*, 333 F.3d at 98 (endorsing the views of the Ninth Circuit in *Cripe*). Here, Dillard's fails to show undisputed facts sufficient to show that its inquiry was both job-related and consistent with business necessity.

### 1.   Dillard's fails to point to a vital business necessity served by the policy.

To meet its burden of showing that the policy relates to a vital business necessity, Dillard's must present "significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Brownfield*, 612 F.3d at 1146 (citing *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999). "An employee's behavior cannot merely be annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions." *Id.* at 1146 (quoting *Sullivan*, 197 F.3d at 811); *see also Conroy*, 333 F.3d at 98 ("An employer cannot simply demonstrate that an inquiry is convenient or beneficial to its business."). "[W]hat

1   constitutes a business necessity will undoubtedly vary in different workplaces." *Conroy*, 333

2   F.3d at 99.  Thus, the employer must make a particularized showing of the facts on which it

3   relied at the time. *Brownfield*, 612 F.3d at 1146; *Conroy*, 333 F.3d at 813 ("Factual development

4   on the efficacy of general diagnoses (as opposed to certification without diagnoses) in improving

5   work-place health and security and in curbing sick leave abuse is particularly necessary.").

6          The evidence required to meet this burden is highlighted in the Ninth Circuit's decision in

7   *Yin.*  In support of its claim of "business necessity", the employer in *Yin* submitted two

8   declarations that "set forth in detail [the employee]'s excessive absenteeism and the effect such

9   absenteeism ha[d] on the workload of both [the employee] and her office."[16] *Yin*, 95 F.3d at 868

10  n.6.  With "undiputed facts [that] show [the employee's] excessive absenteeism had taken a

11  serious and deleterious toll on her productivity and overall job performance," the court affirmed

12  summary judgment.  *Id.*  Here Dillard's has not, and cannot, present any comparable evidence.

13         Dillard's asserts that its vital need for the condition being treated include "verifying the

14  legitimacy of the medical absence and effectuating the Policy, which permitted only verifiable

15  medical absences to be excused" and "to ensure an employee can safely return to work and does

16  not pose a direct threat to the health or safety of other individuals in the workplace."  Defs.' 1st

17  Mem. 14:3-5, 15:18-21 (quotation marks omitted).  Unlike the employer in *Yin*, however,

18  Dillard's presents no undisputed facts sufficient to show that these claimed concerns were a vital

19  necessity for their business.  Moreover, where Dillard's Manager Penny Ervin instructed Corina

20  Scott to simply forge some diagnosis in order to meet the requirements of Dillard's policy,

21  Dillard's cannot be heard to argue that there is a legitimate business need for the information.

22  The burden is Dillard's, yet they present no objective evidence that they originally implemented

23  the inquiry policy in reaction to some vital business need.  Dillard's is a retail department store.

24

25  [16]      Highlighting the importance of the employer's burden of presenting particularized facts,
    the Second Circuit remanded the *Conroy* case in order to give the employer an opportunity "to

26  submit evidence that it has a legitimate and vital need to protect against [the claimed necessity of
    severe disruption caused by infectious diseases], and that its general diagnosis requirement helps

27  to alleviate the concern").  *Conroy*, 333 F.3d at 99 ("Factual development on the efficacy of
    general diagnoses (as opposed to certification without diagnoses) in improving work-place health

28  and security and in curbing sick leave abuse is particularly necessary.")

1   Dillard's employees are sales clerks.  The ADA cannot be interpreted to permit Dillard's to state

2   such wide-ranging "business necessities" without any evidence, much less undisputed evidence.

3   Such an interpretation would effectively obviate the need for the job-related prong altogether.

4   Because Dillard's has not met its burden of establishing the job-related element of its business

5   necessity defense as a matter of law, this Court should deny the motion for summary judgment

6   on that issue.

7   **2.      Dillard's inquiries were not consistent with business necessity because they**

8   **did not carefully target the claimed necessity.**

9   To meet its burden of showing that the policy matches the need, Dillard's must present

10   sufficient evidence that "the examination or inquiry genuinely serves the asserted business

11   necessity and that the request is no broader or more intrusive than necessary."  *Conroy*, 333 F.3d

12   at 98; *Brownfield*, 612 F.3d at 1146.  An inquiry genuinely serves the asserted necessity where it

13   is limited to job-related functions and narrowly tailored.  *Conroy*, 333 F.3d at 94 ("a general

14   diagnosis is not a narrowly tailored inquiry into the employee's ability to carry out her job-

15   related functions").  "The employer need not show that the examination or inquiry is the only

16   way of achieving a business necessity, but the examination or inquiry must be a reasonably

17   effective method of achieving the employer's goal."  *Conroy*, 333 F.3d at 98.

18   Dillard's presents no undisputed facts sufficient to show that that its policy requiring an

19   employee to disclose the condition being treated in order to excuse a single day of absence is

20   carefully targeted at its claimed necessities of verifying absences and safeguarding health and

21   safety of others.  Dillard's asserts, without evidence, that its policy "provided numerous

22   operational benefits."  Defs.' 1st Mem. 16:8-9.  However, mere expediency is not enough, even

23   where established by sufficient undisputed facts.  The burden is Dillard's, yet Dillard's fails to

24   explain how requiring the medical condition on the doctor's note, as opposed to just requiring a

25   doctor's note with generalized information explaining the need for a health-related absence,

26   accomplishes Dillard's alleged goal of  being able to verify an employee's absence.  Again,

27   where Dillard's manager Penny Ervin instructed Corina Scott to simply fabricate any diagnosis

28   to meet the requirement highlights the fact that there was in fact no real business need to

1 discover the nature of her disability.  Likewise, Dillard's fails to explain how knowing what

2 condition an employee *had* that necessitated an absence, gets Dillard's any closer to being able to

3 prevent the spread of an employee's *current* communicable diseases after being cleared to return

4 to work.

5       As Dillard's can not make any particularized showing of how the inquiry at issue is

6 consistent with business necessity, its motion in this regard should be summarily denied.

7 **V.**     **Summary judgment on compensatory and punitive damages claims for violations of**

8       **§ 12112(d) violations is improper.**

9       As relevant here, the controlling damages statute allows plaintiffs to recover

10 compensatory and punitive damages against respondents (1) "who violated the requirements of .

11 . . § 102 [12112]," and (2) those who "committed a violation of §102(b)(5) [12112(b)(5)]."  42

12 U.S.C. § 1981a(2).  In other words, damages are available if an employer (1) violated the

13 requirements of § 12112 *or* (2) committed a violation of subsection (b)(5).

14       Dillard's argues that the damages statute should be read to allow damages only for

15 violations of subsection 12112(a) and subsection 12112(b)(5), exclusive of subsection 12112(d),

16 the medical inquiries subsection.  Defs.' Mem. Supp. Mot. Summ. J. 16:12 – 20:15, ECF. 73-1.

17 Therefore, the argument goes, EEOC should not be allowed to seek compensatory or punitive

18 damages in this medical inquiries case.  This argument fails for several reasons.  *Id.*

19       First, the plain language of the statute authorizing compensatory and punitive damages

20 under the ADA, expressly applies to section "12112" not "12112(a)."  In other words, Congress

21 did not include a reference to subsection 12112(a) in the damages statute.  If Congress had

22 intended to limit the reach of the damages statute to subsection (a), it could have added the

23 restriction "(a)."  If Congress had done so, it would have narrowed the availability of damages

24 from all employers "who violated the requirements of . . . § 102 [12112]," to just employers

25 "who violated the requirements of . . . § 102(a) [12112(a)]."  But Congress did not do so.

26 Neither should this court.  *See, e.g., Cavanaugh v. U.S. Dist. Court*, 306 F.3d 726, 738 (9th Cir.

27 2002) ("[W]e may not add to the statute terms that Congress omitted . . . .").

28

1    Rather than reading a restricting term into the damages statute that Congress did not

2  include, the Court should instead subscribe to an interpretation that does not require adding

3  additional terms.  The most obvious such reading is that Congress saw a distinction between its

4  use of the phrase "violated the requirements of" and its use of the phrase "committed a violation

5  of."  It is easy to understand why Congress would see such a distinction: within the whole of

6  §12112, subsection (b)(5) is unique; it creates an affirmative obligation (provide

7  accommodation), whereas the rest of the subsections merely delineate prohibitions.  *See* 42

8  U.S.C. § 12112.  Accordingly, the simplest interpretation that gives effect to all the language of

9  the damages statute is that Congress treated § 12112 subsection (b)(5) differently from the rest of

10  § 12112 because (b)(5) is different (it creates an affirmative obligation), and Congress wanted to

11  ensure that this unique subsection was encompassed by the damages statute.  *Cf. Corley v.*

12  *United States*, 129 S. Ct. 1558, 1566 ("A statute should be construed so that effect is given to all

13  its provisions, so that no part will be inoperative or superfluous, void or insignificant.").

14    Additionally, EEOC's interpretation is also the only logical reading of the damages

15  statute in light of language used in § 12112.  Section 12112 subsection (d) is titled "medical

16  examinations and inquiries."  It specifies that: "The prohibition against discrimination as referred

17  to in subsection (a) shall include medical examinations and inquiries."  42 U.S.C. § 12112(d).

18  Accordingly, by explicit statutory language, subsection (a) includes subsection (d).  This renders

19  illogical Dillard's proffered argument that the damages statute includes subsection (a) but

20  excludes subsection (d).  *See Henderson v. United States*, 476 U.S. 321, 335 (U.S. 1986)

21  (adopting one statutory interpretation over the other because the former was "a far more logical

22  reading of the statute, and is more in keeping with the overall purpose of the . . . Act.").

23    Moreover, EEOC's interpretation of the damages statute is consistent with Congress's

24  stated intent.  Specifically, Congress intended to make damages more widely available when

25  employers violate employees' rights under the ADA.  *See, e.g.,* H.R. Rep. 102-40(II), at 27

26  (1991), reprinted in 1991 U.S.C.C.A.N. 694, 721 ("All too frequently, Title VII leaves victims of

27  employment discrimination without remedies of any kind of [sic] their injuries and allows

28  employers who intentionally discriminate to avoid any meaningful liability.").

1    Finally, EEOC's interpretation is consistent with the fact that other courts have

2    interpreted and applied the damages statute to provide for damages for violations of subsection

3    12112(d), the medical inquiries subsection.  *See, e.g., Indergard v. Georgia-Pacific Corp.*, 582

4    F.3d 1049, 1050, 58, 61 (9th Cir. 2009) (remanding to continue subsection 12112(d) case in

5    which plaintiff sought $250,000 in damages); *Indegaard v. Georgia-Pacific Corp.*, 2010 U.S.

6    Dist. LEXIS 69887 (D. Or. June 14, 2010) (finding that the Ninth Circuit's remand effectively

7    held that compensatory damages are available for subsection 12112(d) claims where plaintiff

8    shows that the violation caused harm); *accord Bates v. Dura Auto. Sys*., 2011 U.S. Dist. LEXIS

9    97692, *5-6 (M.D. Tenn. Aug. 30, 2011) (allowing punitive damages award subsection 12112(d)

10   case, but reducing that award to the statutory cap).[17]

11   In sum, EEOC urges this court to reject Dillard's argument that the damages statute, 42

12   U.S.C. § 1981(a)(2), only allows for compensatory and punitive damages when an employer

13   violates subsections (a) or (b)(5) of § 12112, and not in cases when an employer violates

14   subsections (d) of § 12112.  Instead, EEOC urges this court interpret 42 U.S.C. § 1981(a)(2) to

15   allow for compensatory and punitive damages if an employer *either* (1) violates the requirements

16   of § 12112 (inclusive or subsection (d)) *or* (2) commits a violation of subsection (b)(5).  This

17   interpretation is supported by cannons of statutory interpretation, logic, the Ninth Circuit, and

18   other courts.

19

20

21

22   [17]    Dillard's may argue that the Ninth Circuit held to the contrary in *Alvarado*.  That case

23   involved whether compensatory and punitive damages are available in ADA retaliation cases
     brought under 29 U.S.C. § 215(a)(3) and 42 U.S.C. § 12203.  *Alvarado v. Cajun Operating Co*.,

24   588 F.3d 1261, 1263 (9th Cir. Ariz. 2009).  The court in that case analyzed the damages statute,
     42 U.S.C. § 1981(a)(2), and noted that while it provides for damages for violations of § 12112, it

25   does not mention  § 12203.  *Id*. at 1268.  In passing, the court referred to § 12112 by citing and
     quoting subsection (a).  *Id.*  This passing reference, however, was not at issue.  *See id.*

26   Moreover, the *Alvardo* court did not consider whether Congress intended the damage's statute's
     use of "§12112" to be inclusive or exclusive of subsection (d).  *See id.*  Accordingly, this court

27   should not rely on *Alvarado* as authority on whether the damages statute is inclusive of
     §12112(d).  *See, e.g., United States v. Ritchie*, 362 Fed. Appx. 687, 689 (9th Cir. 2010)

28   (explaining that "dicta should not be cited to future panels as authority").

**VI.    There are material issues of fact regarding punitive damages.**

       **A.    Dillard's knew there was a risk that its policy violated the ADA.**

       Dillard's argues that even if punitive damages are generally available in subsection (b)(5), Defs.' 1st Mem. 20:17 – 22:18, summary judgment on punitive damages is nonetheless inappropriate in this case.  More specifically, Dillard's argues that because there is an interpretation of the law that could allow this policy, EEOC cannot show that Dillard's acted with the malice or reckless indifference necessary to justify punitive damages.  *Id.*  This argument fails because it misunderstands the relevant legal standards.

       In order to justify punitive damages, the plaintiff must show that the employer acted with reckless indifference to employees' federally protected rights.  *Kolstad v. Am. Dental Ass'n.,* 119 S. Ct. 2118, 2124 (1999).  In *Kostad,* the Supreme Court explained what amounts to requisite intent necessary to show that reckless indifference.  Specifically, the Court explained that the necessary intent is established where the plaintiff shows that the employer acted "in the face of a perceived risk that its actions will violate federal law."  *Id.*

       Accordingly, the substantive question here is not: Did Dillard's interpret the law in its favor.  Neither is it: Can Dillard's make a reasoned argument in support of its interpretation.  Instead, the relevant question is: Did Dillard's act "in the face of a perceived risk that its actions will violate federal law."  That is, did Dillard's know that there was a risk that its policy *may* violate the ADA's prohibition on medical inquiries.  This is about Dillard's' knowledge of risk.  This is a question of fact for the jury.  *See, e.g., Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1199 (9th Cir. 2002) (holding that "[t]he record contains substantial evidence from which a reasonable juror could conclude that [the defendant] was aware of anti-discrimination laws and acted in the face of this awareness").

       Thus, the ultimate question here is whether, considering the evidence in the light most favorable to EEOC, a reasonable jury could conclude that Dillard's knew that there was a risk that its policy *might* violate the ADA's prohibition on medical inquiries.  The answer is yes.  There is ample evidence from which a reasonable jury could conclude that Dillard's knew there was a risk that its policy might be an unlawful medical inquiry.

1    Dillard's is a large, sophisticated employer, represented in employment matters by

2    capable, learned counsel.  Accordingly, a jury could reasonably infer that Dillard's is familiar

3    with the ADA's mandates, EEOC's Guidance on the ADA, and how the federal courts have

4    interpreted the ADA.

5    The ADA prohibits employers from making "medical . . . inquiries . . . . as to whether

6    [an] employee is an individual with a disability or as to the nature or severity of the disability . . .

7    ." 42 U.S.C. § 12112(d).  Because a reasonable jury could conclude that Dillard's was aware of

8    the ADA, a reasonable jury could conclude that Dillard's knew that certain medical inquiries are

9    unlawful under the ADA.

10   EEOC is the agency charge by Congress with enforcing the ADA, including

11   promulgating regulations and guidance interpreting the ADA.  EEOC published guidance to

12   clarify what amounts to an unlawful medical inquiry.  In relevant part this guidance explains

13   that:  The ADA "limits an employer's ability to make disability-related inquiries . . . .  Disability-

14   related inquiries may include . . . . asking an employee a broad question about his/her

15   impairments that is likely to elicit information about a disability."  Questions and Answers:

16   Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees

17   Under the Americans with Disabilities Act (ADA), (EEOC, July 2[6], 2000) [EEOC Notice

18   915.002, 2000 WL 33407183, at *1-2].

19   Because a reasonable jury could conclude that Dillard's was aware of EEOC guidance, a

20   reasonable jury could conclude Dillard's knew that EEOC had advised that "asking an employee

21   a broad question about his/her impairments" is unlawful under the ADA because such questions

22   are "likely to elicit information about a disability."  Dillard's policy required employees "state

23   the nature of the absence (such as migrane [sic], high blood pressure etc . . . [sic]."  (Ex. A.)

24   Having concluded that Dillard's was aware of EEOC guidance, a reasonable jury could conclude

25   that Dillard's was aware that there was a risk that this policy was "likely to elicit information

26   about a disability," and, therefore, that there was a risk that the policy was unlawful.

27   Three years before Dillard's enacted this policy, the Federal Court of Appeal for the

28   Second Circuit decided *Conroy v. N.Y. State Department of Correctional Services*.  333 F.3d 88,

1  95 (2d Cir. N.Y. 2003).  At issue in that case was an employer's policy requiring employees to

2  provide "medical documentation" that was "be sufficiently informative as to allow [the

3  employer] to make a determination concerning the employee's entitlement to leave . . . ."  *Id.*

4  The policy required employees provide a general diagnosis of their illnesses when out sick.  It

5  specified that: "If a doctor's note states that an employee is 'under my care', this is not sufficient.

6  However, if a doctor's note, for example, states 'recuperating from minor surgery' or 'treated for

7  a minor foot injury', this is a sufficient diagnosis."  The Second Circuit decided that what the

8  'general diagnosis' required "may tend to reveal a disability."  *Id.*  For this reason, the Second

9  Circuit further held that "requiring a general diagnosis is sufficient to trigger the protections of

10  the ADA under this provision [§ 12112(d)] and that summary judgment in [the plaintiff's] favor

11  was appropriate on this element."  *Id.*

12        Because a reasonable jury could find that Dillard's was aware of existing case law, it

13  could conclude that Dillard's was familiar with *Conroy.*  Conroy's policy required employees

14  disclose specificity such as "recuperating from minor surgery" or "treated for a minor foot

15  injury."  Dillard's' policy required employees disclose specificity such as "migraine" or "high

16  blood pressure."  Based on the similarity of specificity required by these two polices, a

17  reasonable jury could also conclude that the policy in *Conroy* is similar to the Dillard's policy.

18  Accordingly, a reasonable jury could conclude that Dillard's was aware that there was a risk that,

19  like the policy in *Conroy*, its policy might also be unlawful.

20        In sum, a reasonable jury could easily conclude that that Dillard's was familiar with the

21  ADA's mandates, EEOC's Guidance on the ADA, and how the federal courts have interpreted

22  ADA.  A reasonable jury could further conclude that Dillard's familiarity with content of those

23  sources made it aware that there was a risk that its policy was unlawful.  This is sufficient to

24  establish the reckless disregards for employees' federally protected rights necessary to support an

25  award of punitive damages.

26        Dillard's argues that its policy was permissible under EEOC's guidance on doctor's

27  notes.  Defs.' 1st Mem. 21.  EEOC agrees that the guidance explains that an employer may ask

28  for a doctor's note to justify sick leave.  The guidance does not state, however, that an employer

may require the doctor's note to explain the nature of the illness.  *See* C. Kuczynski, "ADA: Disability-Related Inquiries and Medical Examination of Employees, EEOC Informal Opinion Ltr. (Oct. 5, 2004).  Moreover, as cited in Dillard's motion, other guidance specifically warns employers "the information must be limited in scope."  Defs.' 1st Mem. 21:13-15.  Dillard's also argues that to the extent that its policy is unlawful according to EEOC's guidance, that guidance was not clear.  It further argues that even if the guidance was clear, the guidance is only entitled to *Skidmore* deference, and that under the *Skidmore* standard, the guidance is not persuasive. While these arguments might appropriately be marshaled in support of Dillard's merit's argument, none of these arguments obviates the genuine issue of dispute on the issue of punitive damages.  As outlined above, in spite of possible legal interpretations that may support Dillard's merits position, there are facts on which a reasonable jury could conclude that Dillard's was aware that it was acting in the face of a risk that its policy was unlawful.  Accordingly, summary judgment on punitive damages is inappropriate.

**B.    Dillard's knew there was a risk that its policy was not within the business necessity exception.**

Dillard's might also assert that summary judgment on punitive damages is appropriate on the independent ground that its policy fell within the "job-related and consistent with business necessity" exception.  Because its policy fell within the exception, the argument goes, it was not unlawful, and therefore EEOC cannot show that Dillard's acted with the malice or reckless indifference necessary to justify punitive damages.  This argument also fails, however, because it too is premised on a misunderstanding of the relevant legal standards.

Under the legal standards outlined above, the ultimate question here is whether, considering the evidence in the light most favorable to EEOC, a reasonable jury could conclude that Dillard's knew that there was a risk that its policy *might not* fall within the business necessity exception.  The answer to this question is yes.

In *Conroy*, the district court had articulated a legal standard for determining whether the employer could reasonably expect that its inquiry policy fell within the "job-related and consistent with business necessity" exception.  That standard was:

> In order to fall within the [business necessity] exception . . . , the employer must demonstrate some reasonable basis for concluding that the inquiry was necessary. That is, the employer must show that it had some reason for suspecting that the employee, or class of employees, would be unable to perform essential job functions or would pose a danger to the health and safety of the workplace.

*Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003).  The district court concluded that under this standard, "no reasonable factfinder could conclude that [a medical] inquiry triggered by a single day's absence from work is the type of reasonable expectation" of falling within the business necessity exception.  *Id*.  The Second Circuit endorsed this approach.  *Id*. ("We believe the district court's approach here was generally sound.").

Because a reasonable jury could conclude that Dillard's was familiar with the *Conroy* decision, a reasonable jury could also conclude that Dillard's knew that a federal appellate court had held that "no reasonable factfinder could conclude that [a medical] inquiry triggered by a single day's absence from work is the type of reasonable expectation" that could fall within the business necessity exception.  A reasonable jury could also conclude that Dillard's policy did make medical inquiries triggered by a single day's absence, and that Dillard's knew this.  From these factual premises, a reasonable jury could easily conclude that Dillard's acted in the face of a perceived risk that its policy did not fall within the business necessity exception.  Accordingly, the business necessity exception does not render summary judgment on punitive damages appropriate in this case.

**VII.    Summary judgment on EEOC's claim for injunctive relief is improper.**

Dillard's asserts that it is entitled to summary judgment on EEOC's claims for injunctive relief because it has ended the unlawful policy at issue in this lawsuit.  Defs.' 1st Mem. 22:20-26.  Accordingly, Dillard's argues, the need for injunctive relief is moot.  *Id*. ("the only requested relief remaining is injunctive relief – which is moot as Dillard's revoked the Policy . . . .").  This argument fails because it is premised on a misunderstanding of the mootness doctrine.

As Erwin Chemerinsky explains, "[a] case is not . . . moot if the defendant voluntarily ceases the allegedly improper behavior but is free to return to it at any time."  ERWIN CHEMERINSKY, FEDERAL JURISDICTION 139 (5th ed.2007).  "Only if there is no reasonable chance

that the defendant could resume the offending behavior is the case deemed moot on the basis of voluntary cessation." *Id*. at 139-40.  Chemerinsky's statement of law accords perfectly with the Supreme Court's statement in *Laidlaw*:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.   * * *   In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent:   A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.   The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, *Inc.,* 120 S. Ct. 693, 708 (U.S. 2000) (internal quotation marks and citation omitted).

Assuming Dillard's voluntarily stopped following the unlawful policy at issue, that cessation was voluntary.  Therefore the issue is not "moot" because Dillard's "is free to return to it at any time."  Certainly, Dillard's has pointed to nothing that would satisfy its "heavy burden" of establishing that "the challenged conduct cannot reasonably be expected to start up again." Accordingly, Dillard's has not shown that EEOC's claim for injunctive relief is moot.

Surprisingly, Dillard's cites to *Dupnik* to support its argument that injunctive relief is moot as a result of Dillard's voluntary cessation.  That case, however, was not about the voluntary-cessation exception to mootness; it was about the "wrongs capable of repetition yet evading review" exception.  *Mitchell v. Dupnik*, 75 F.3d 517, 528 (9th Cir.1996) ("Shabazz argues, however, that the circumstances of his case are 'capable of repetition yet evading review,' and therefore merit exception . . . .").  The "capable of repetition" exception is distinct from the "voluntary cessation" exception.  *See, e.g., Vitek v. Jones*, 445 U.S. 480, 503 (1980) ("'[C]apable of repetition' doctrine does not apply here.  Neither does the liberal rule applied in 'voluntary cessation' cases . . . ."); *see also* FEDERAL JURISDICTION at 135-144.  Accordingly, Dillard's invocation of the *Dupnik* court's "capable of repetition" analysis does support Dillard's argument that its voluntary cessation of its policy renders EEOC's injunctive claims moot.

1    Dillard's reliance on *Laidlaw* is likewise perplexing.  Dillard's argues that in *Laidlaw* the

2    Court held that "where, as here, a plaintiff seeks injunctive relief, the plaintiff must demonstrate

3    that, despite the cessation of the complained conduct, defendant is 'realistically threatened by

4    repetition of [the violation].'"  Defs.' 1st Mem. 23:3-8 (citing and quoting *Laidlaw*, 120 S. Ct. at

5    708 [528 U.S. at 189]).  Unfortunately, the language that Dillard's placed in quotation marks

6    does not appear in the *Laidlaw* opinion.[18]  In fact, no where in *Laidlaw* does the Court state that

7    the voluntary cessation burden is on the plaintiff.  On the contrary, as noted above, the *Laidlaw*

8    Court explicitly stated that: "It is well settled that a defendant's voluntary cessation of a

9    challenged practice does not deprive a federal court of its power to determine the legality of the

10   practice.  * * *  The heavy burden of persuading the court that the challenged conduct cannot

11   reasonably be expected to start up again lies with the party asserting mootness."  120 S. Ct. at

12   708.  Accordingly, *Laidlaw* does not support the proposition that "where . . . a plaintiff seeks

13   injunctive relief, the plaintiff must demonstrate that, despite the [voluntary] cessation of the

14   complained conduct, defendant is 'realistically threatened by repetition of [the violation].'"

15   Finally, *Lyons*, the last case cited by Dillard's, also lends no support to Dillard's

16   argument that its voluntary cessation renders EEOC's injunctive claims moot.  Mootness is not at

17   issue in *Lyons.*  On the contrary, at the threshold of its analysis, the *Lyons* Court noted that

18   mootness was not at issue as the defendant had only voluntarily suspended the challenged policy.

19   *L.A. v. Lyons*, 461 U.S. 95, 101 (1983) ("We agree . . . that the case is not moot, since the

20   moratorium by its terms is not permanent.").  In fact, at the page pin-cited by Dillard's, 461 U.S.

21   at 109, the *Lyons* Court specifically explains that:

22   
23   [T]he issue here is not whether that claim has become moot but whether Lyons
     meets the preconditions for asserting an injunctive claim in a federal forum
24   [standing].  The equitable doctrine that cessation of the challenged conduct does
     not bar an injunction is of little help in this respect [i.e., it is not implicated], for
25   Lyons' lack of standing does not rest on the termination of the police practice but
     on the speculative nature of his claim that he will again experience injury as the
26   result of that practice even if continued.

27

28
_____
[18]    Neither does the quote appear in the other cited case—*L.A. v. Lyons*, 461 U.S. 95 (1983).

1    In short, *Lyons* recognizes the "equitable doctrine that cessation of the challenged

2  conduct does not bar an injunction."  But, as the *Lyons* Court explained, that doctrine was not at

3  issue.  Instead, *Lyons* analyzes the standing of a private party plaintiff to challenge a police

4  department policy when the plaintiff was not in policy custody and might never again be in

5  policy custody.  Accordingly, as a standing case, *Lyons* does not support Dillard's mootness

6  argument.  Standing is, of course, distinct from mootness.  *Laidlaw*, 528 U.S. at 191 ("We

7  acknowledged the distinction between mootness and standing most recently in Steel Co.").

8    Here Dillard's asserts that because it has voluntarily ceased its policy, EEOC's claims for

9  injunctive relief are moot.  Thus, the issue is the voluntary cessation exception to the mootness

10  doctrine.  The burden is Dillard's.  They have not met it.  Accordingly, summary judgment on

11  EEOC's injunctive claims is improper.

12  **VIII.    Conclusion**

13    Dillard's subjected its employees to a policy which did not just seek generalized

14  information to verify a health-related absence, but which made inquiry into the exact nature of

15  any disability that may have required an absence from work.  This policy violates the express

16  provision of the ADA which prohibits medical inquiries as to whether an employee is "an

17  individual with a disability or as to the nature or severity of the disability…"  The policy also

18  violates congressional intent in passing the prohibition on medical inquiries by exposing

19  employees to the stereotypes and stigmas that may be associated with a disability in their

20  workplace.  Dillard's cannot establish that this inquiry was job-related or consistent with

21  business necessity and, as such, it is liable for the unlawful inquiry.  Moreover, compensatory

22  damages, punitive damages and injunctive relief are both available and appropriate under

23  applicable statutes.  Given the foregoing EEOC respectfully requests that this Court deny

24  Dillard's motion for summary judgment in its entirety.

25  Date:  January 23, 2012                    Respectfully Submitted,

26                                                       U.S. Equal Employment Opportunity Commission
27                                        By:    */s/ Thomas S. Lepak*
                                                         Thomas S. Lepak
28                                                       EEOC Trial Attorney